

# The Attorney General of Texas

April 19, 1984

**JIM MATTOX**
Attorney General

Supreme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

714 Jackson, Suite 700
Dallas, TX. 75202-4506
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

1001 Texas, Suite 700
ʒuston, TX. 77002-3111
, 13/223-5886

806 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

Honorable Mack Wallace
Chairman
Railroad Commission of Texas
P. O. Drawer 12967
Austin, Texas    78711

Opinion No.  JM-147

Re:  Construction of secti(
5.02(b)  of  article  1446(
V.T.C.S., the Public Utili(
Regulatory Act

Dear Mr. Wallace:

You  have  asked  whether  section  5.02(b)  of  article  1446(
V.T.C.S., the Gas Utility Regulatory Act [hereinafter GURA], preclud(
the Railroad Commission from investigating the reasonableness of
change in rates between pipelines in instances in which the chan(
will directly or indirectly affect a city gate rate. We conclude th;
you are _not_ so precluded. We conclude that the commission m;
investigate the reasonableness of the rate charged in _any_ pipeline-t(
pipeline transaction in _any_ instance in which the gas so transferr(
will ultimately be sold at a city gate for resale to a gas distribı
tion utility.

Section  5.02  of  GURA  was  enacted  by  Acts  1983,  Sixty-eighı
Legislature,  chapter  263,  section  20,  p.  1203,  to  provide  tl
following:

Sec. 5.02.  JUST AND REASONABLE RATES  (a)  It
shall be the duty of the regulatory authority to
ensure that _every rate_ made, demanded, or received
by any gas utility, or by any two or more gas
utilities jointly, _is just and reasonable_. Rates
may not be unreasonably preferential, prejudicial,
or  discriminatory,  but  must  be  sufficient,
equitable, and consistent in application to each
class of consumers.  For ratemaking purposes, the
railroad  commission  may  treat  two  or  more
municipalities served by a gas utility as a single
class if the railroad commission considers that
treatment to be appropriate.

(b)  Rates charged or offered to be charged by
a  gas  utility  for  pipeline-to-pipeline  trans-
actions  and  to  transportation,  industrial,  and

other similar large volume contract customers, but excluding city gate sales-for-resale to gas distribution utilities, <u>are considered to be just and reasonable</u> and otherwise to comply with this section, <u>and shall be approved by the regulatory authority, if</u>:

(1) neither the gas utility nor the customer had an unfair advantage during the negotiations;

(2) the rates are substantially the same as rates between the gas utility and two or more of those customers under the same or similar conditions of service; <u>or</u>

(3) competition does or did exist either with another gas utility, another supplier of natural gas, or with a supplier of an alternative form of energy.

(c) If a complaint is filed with the railroad commission by a transmission pipeline purchaser of gas sold or transported under any such pipeline-to-pipeline or transportation rate, then the provisions of Subsection (b) shall not apply. (Emphasis added).

Section 5.02 of GURA was originally contained in section 38 of section 1446c, V.T.C.S., the Public Utility Regulatory Act [hereinafter PURA]. Section 5.02 of GURA is virtually identical to the now repealed section 38(b) of PURA. Section 38(b) of PURA was amended by Acts 1981, Sixty-seventh Legislature, chapter 751, section 1, p. 2749.

Prior to the passage of the 1981 amendment, section 38 read as follows:

Sec. 38. It shall be the duty of the regulatory authority to insure that every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable. Rates shall not be unreasonably preferential, prejudicial, or discriminatory, but shall be sufficient, equitable, and consistent in application to each class of consumers. For ratemaking purposes, the commission or railroad commission may treat two or more municipalities served by a public utility as a single class wherever the commission or railroad

commission deems such treatment to be appropriate. Rates charged by a gas utility to an industrial customer for supplying gas under a contract and other similar large volume contract customers are just and reasonable and shall be approved by the regulatory authority if the regulatory authority finds that:

(1) neither the gas utility nor the industrial customer had an unfair advantage during the contract negotiations; or

(2) the rates in the contract are substantially the same as rates contained in contracts between the gas utility and two or more other industrial customers contracting under the same or similar conditions of service; or

(3) competition exists either with another gas utility, another supplier of natural gas, or with a supplier of an alternative form of energy.

The above underscored language was amended and, in its amended version, became subsection (b). A subsection (c) was also added. We should first note the effect of the 1981 amendment and the 1983 enactment.

The above underscored language of pre-1981 section 38 created a presumption that rates charged by a gas utility to an industrial customer and to other similar large volume contract customers for supplying gas under contract were deemed to be just and reasonable and had to be approved by the appropriate regulatory authority if that authority found the existence of only one of three specified facts. The class of consumers affected by this presumption was comparatively small. It affected only industrial customers or other similar large volume contract customers. With respect to all other natural gas consumers, the appropriate regulatory agency, in this instance the Railroad Commission, was still required to "insure that every rate made, demanded, or received by any public utility . . . be just and reasonable . . . [and that they] shall not be unreasonably preferential, prejudicial, or discriminatory, but shall be sufficient, equitable, and consistent in application to each class of consumers."

As a result of the 1981 amendment and the 1983 enactment, the class of consumers directly and indirectly affected by the presumption is greatly expanded. Now the presumption reaches all pipeline-to-pipeline transactions and transportation large volume contract customers, as well as industrial and other similar large volume contract customers, while purportedly expressly excluding transactions

involving city gate sales to gas distribution utilities for resale to individual residential and commercial consumers.

An example will illustrate the dilemma in which the 1981 amendment and the 1983 enactment places the commission. By virtue of the recently-amended presumption, rates charged by a gas utility in any pipeline-to-pipeline transaction, excluding a city gate sale-for-resale to a gas distribution utility, are deemed to be just and reasonable and the commission must approve them if the commission finds the existence of only one of three specified facts. At the same time, the commission is required to regulate city gate sales and, again, to "insure that every rate made, demanded, or received by any gas utility . . . is just and reasonable . . . . [They] may not be unreasonably preferential, prejudicial, or discriminatory, but must be sufficient, equitable, and consistent in application to each class of consumers." V.T.C.S. art. 1446e, §5.02(a). Accordingly you ask whether the commission is precluded from investigating the reasonableness of a rate charged between pipelines in instances in which the change in rate will directly or indirectly affect a city gate rate.

It is suggested that the section 5.02(b) presumption should properly be interpreted as limiting the authority of the railroad commission in any pipeline-to-pipeline or other large volume contract customer transaction, other than one involving a city gate sale-for-resale to a gas distributing utility, to an investigation as to the finding of any one of three specified facts. Under this interpretation, if the commission finds the existence of any one of three specified facts in such a transaction, it shall deem that the rate so charged is just and reasonable and shall approve such rate. The authority of the commission to fully investigate the reasonableness of a rate charged in a pipeline-to-pipeline or large volume contract customer transaction is limited to only one kind of large volume transfer -- the pipeline-to-pipeline or large volume contract sale of gas at the city gate for resale to a gas distribution utility.

On the other hand, it is suggested that the section 5.02(b) presumption should properly be interpreted to reach only those pipeline-to-pipeline or other large volume contract customer transactions in which no city gate sale-for-resale to a gas distribution utility will occur later in the chain of transactions. Under this interpretation, the commission is authorized to investigate the reasonableness of any rate charged in a city gate sale, as well as the rate charged for such gas in any large volume transfer prior to the gas reaching the city gate. This second interpretation is the one which comports both with the act as a whole and with the evident intent of the legislature when it amended section 38 of PURA in 1981 and subsequently codified the amendment as section 5.02(b) of GURA.

An examination of other relevant provisions of GURA support our conclusion.

Section 1.02 of GURA sets forth the legislative policy and purpose of the Gas Utility Regulatory Act:

> Sec. 1.02. This Act is enacted to protect the public interest inherent in the rates and services of gas utilities. The legislature finds that gas utilities are by definition monopolies in the areas they serve; that therefore the normal forces of competition which operate to regulate prices in a free enterprise society do not operate; and that therefore utility rates, operations, and services are regulated by public agencies, with the objective that the regulation shall operate as a substitute for competition. The purpose of this Act is to establish a comprehensive regulatory system that is adequate to the task of regulating gas utilities as defined by this Act, and to assure rates, operations, and services which are just and reasonable to the consumers and to the utilities. (Emphasis added).

See also Tex. Const. art. I, section 26 (forbidding monopolies in Texas). Section 5.01 of GURA sets forth the authority of the commission to ensure that the purposes of the act are achieved:

> Subject to the provisions of this Act, the railroad commission is hereby vested with all authority and power of the State of Texas to ensure compliance with the obligations of gas utilities in this Act. For this purpose the regulatory authority is empowered to fix and regulate rates of gas utilities, including rules and regulations for determining the classification of customers and services and for determining the applicability of rates. A rule or order of the regulatory authority may not conflict with the rulings of any federal regulatory body.

And, as we already noted, section 5.02(a) of GURA reposes a duty in the commission "to ensure that every rate made, demanded, or received by any gas utility company is just and reasonable."

Finally, it is clear from transcripts of legislative committee hearings on this amendment that the members of the legislature did not intend to circumscribe the authority of the commission in regulating city gate rates. The author of the bill testified that

> [t]his bill does not affect the city gate sales. As a matter of fact, it states in the substitute specifically that it doesn't.

We further note that the author of what is now section 5.20(b) submitted to us a letter in connection with this opinion request. The writer specifically declared what he intended to be the effect of section 5.02(b) on the commission's authority over city gate rates:

> [Section 5.02(b)] simply restates the traditional exclusion for sales of gas between a transmission pipeline and a distribution company. It has always been deemed necessary for the protection of consumers for this transaction to be subject to thorough scrutiny by a regulatory body. [Section 5.02(b)] leaves this consumer protection in place . . . . As already stated, [the Railroad Commission] practice and state laws over the years have dictated that this sort of event must be subject to comprehensive review in order to protect the public interest. It was never the purpose of [section 5.02(b)] to change, in any way, the [commission's] well-established and well-conceived regulation of either city gate or pipeline-to-pipeline transactions. (Emphasis added).

We are required to construe an amendment in harmony with the act it amends or to which it is added. American Surety Co. v. Axtell Co., 36 S.W.2d 715 (Tex. 1931); Shipley v. Floydada Independent School District, 250 S.W. 159 (Tex. 1923). Our interpretation must express only the will of the makers of the law, not forced or strained, but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain. Railroad Commission of Texas v. Miller, 434 S.W.2d 670 (Tex. 1968). We may not construe the statute so as to ascribe to the legislature an unjust or unreasonable thing, if it is reasonably susceptible of a construction that will not accomplish such a result. Anderson v. Penix, 161 S.W.2d 455 (Tex. 1942). A statute must be construed as a whole, Texas Turnpike Authority v. Shepperd, 279 S.W.2d 302 (Tex. 1955), and all of its parts harmonized if possible. Stark v. Chaison, 50 S.W.2d 776 (Tex. 1932). We must give effect to the entire act, Martin v. Sheppard, 102 S.W.2d 1036 (Tex. 1937), according to the evident intention of the legislature. State v. Jackson, 376 S.W.2d 341 (Tex. 1964). Therefore, we must interpret section 5.02(b) in such a way as to harmonize it with the remaining parts of GURA and so as not to ascribe to the legislature an unreasonable result.

Accordingly, we interpret section 5.02(b) to require the commission to hold a rate just and reasonable and approve such rate in certain transactions after it has found the existence of one of three specified facts, but only if a city gate sale-for-resale to a gas distribution utility is not involved as the final consumer in the chain of transactions. In other words, Gas Utility A can by contract transfer gas to Gas Utility B, such transaction being governed by the presumption created by section 5.02(b). Gas Utility B can, in turn, transfer that gas by contract to a large volume contract industrial customer, again with this second transaction governed by the section 5.02(b) presumption. On the other hand, had Gas Utility B subsequently sold the gas it received from Gas Utility A to a gas distribution facility at the city gate, the section 5.02(b) presumption would be inapplicable and the commission could inquire into the reasonableness of the rate charged in the transaction between Gas Utility A and Gas Utility B. If we were to read the statute in any other way, our interpretation would effectively vitiate the authority of the commission to regulate city gate transactions. This we are unwilling to do, since such a result is clearly not the intent of the legislature.

Accordingly, the Railroad Commission is not precluded by section 5.02(b) of GURA from fully investigating the reasonableness of the rate charged in any pipeline-to-pipeline or other similar large volume contract customer transaction when such a rate will directly or indirectly affect a city gate sale-for-resale to a gas distribution utility.

### S U M M A R Y

The Railroad Commission is not precluded by section 5.02(b) of article 1446e, V.T.C.S., (Gas Utility Regulatory Act) from fully investigating the reasonableness of the rate charged in any pipeline-to-pipeline or other similar large volume contract customer transaction when such rate will directly or indirectly affect a city gate sale-for-resale to a gas distribution utility.

Very truly yours,

JIM  MATTOX
Attorney General of Texas

TOM GREEN
First Assistant Attorney General

DAVID R. RICHARDS
Executive Assistant Attorney General

Prepared by Jim Moellinger
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Rick Gilpin, Chairman
Colin Carl
Susan Garrison
Jim Moellinger
Nancy Sutton